NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                                    :
MADELAINE A. SAMUELS,                :
                                                    :
            Plaintiff,                            :
                                                    :          Civil No. 03-3482 (AET)
            v.                                      :
                                                    :          **OPINION**
POSTMASTER GENERAL,                  :
                                                    :
            Defendant.                         :
_____:

THOMPSON, U.S.D.J.

       This matter comes before the Court on Defendant Postmaster General, John E. Potter's second Motion for Summary Judgment. The Court has decided this Motion after reviewing the submissions of the parties and without oral argument, pursuant to Fed. R. Civ. P. 78. For the following reasons, Defendant's Motion is granted.

BACKGROUND

       On October 3, 2003, Plaintiff filed suit against the Postmaster General of the United States Postal Service for employment discrimination. Plaintiff alleges that Defendant, through his employees, discriminated against her on the basis of her sex and pregnancy by refusing to permit her to return to work and by making disparaging comments regarding her sex and pregnancy. Plaintiff also alleges that Defendant retaliated against her for exercising her protected rights. The following is a recitation of the relevant events regarding Plaintiff's employment and termination that can be garnered from the parties' filings.

-1-

Plaintiff began work at the United States Postal Service in 1972.  After filing two claims under the Federal Employees Compensation Act, 5 U.S.C. § 8101, as the result of a shoulder injury, Plaintiff began working in a modified clerk position in 1987.  In 1990, after another work-related injury, and a settled Equal Employment Opportunity ("EEO") claim, Plaintiff's job was further modified.  On October 12, 1993, Plaintiff stopped reporting to work.  Plaintiff asserts that she left on scheduled maternity leave, placing a sick leave slip in her supervisor's work area. Defendant claims to have no record of the leave slip, and Plaintiff has not produced a copy either. After Plaintiff had been absent from work for about one year, then-Postmaster Ronald Hopkins noticed Plaintiff's name on a "leave without pay report."  (Donnelly Decl. Ex. 11.)  Hopkins investigated Plaintiff's absence and learned that Plaintiff's two supervisors each believed the other had approved Plaintiff's leave.  Defendant sent Plaintiff a letter on February 10, 1995, inquiring as to her availability for duty and requiring that she provide evidence explaining her absence or face removal from service.  Plaintiff did not respond to this letter.[1]

On March 6, 1995, Defendant sent Plaintiff a letter notifying her that she would be fired effective April 14, 1995, due to her absence without official leave and failure to respond to the February 10, 1995 letter.  Plaintiff claims that another doctor, Dr. Bonnie Durrenberger, sent Defendant a letter dated March 15, 1995, stating that Plaintiff could return to work.  (Pl.'s Opp'n

_____

[1]      Plaintiff asserts in her Opposition that her doctor, Dr. Bradford Hinkle, sent a letter to Defendant in February 1995, stating that Plaintiff had fully recovered from her pregnancy and could return to work.  Plaintiff contends that she "gave this letter to two supervisors, without response."  (Pl.'s Opp'n at ii, vi.)  However, Plaintiff has not produced any evidence of this letter's existence or that she gave it to Defendant.  The only letter from Dr. Hinkle the Court could unearth in the voluminous and un-tabbed exhibits submitted by both parties stating his opinion that she had fully recovered from her pregnancy and could return to work is dated February 20, 1996, not 1995.  (Leikauf Decl. Ex. A-4.)

at ii.)  The referred-to letter, however, is addressed on Jersey Shore Perinatal Institute letterhead,

written by Bonnie Durrenberger, "Office Manager," and actually states:

> Madelaine Samuels was under our care for her pregnancy.  Madelaine delivered her
> baby on October 14, 1993 by cesarean section.  This was a month prior to her due
> date.
> Madelaine requires 8 weeks of leave to rehabilitate from the surgery.  We ask that she
> be allowed to stay home with her baby for as long as possible.

(Leikauf Decl. Ex. A-1.)[2]  Defendant does not mention receipt or knowledge of this letter.

In response to the March 6, 1995 notice of termination, Plaintiff filed a union grievance

and entered into negotiations with Defendant to resolve the dispute.  Defendant and Plaintiff,

through her union representative, agreed to settle the grievance by reducing her termination to a

fourteen-day suspension and by granting Plaintiff's request for later work hours to accommodate

her childcare issues.  The settlement noted, however, that pursuant to the Employee and Labor

Relations Manual ("ELM"), Plaintiff was still required to produce medical evidence of her

recovery from her pregnancy before she could return to work because her absence had exceeded

three months.  To obtain this evidence, Plaintiff could go to her own doctor, whose report would

then be sent to Defendant's physician for review, or she could see Defendant's own physician for

the evaluation.  (Donnelly Decl. Exs. 5, 13.)  In response to this requirement, Plaintiff's doctor,

Dr. Bradford Hinkle, sent a letter dated April 29, 1995, to Dr. Mary Rorro, Defendant's

physician.  Dr. Hinkle stated that Plaintiff "now desires to return to work," and he recommended

---

[2]      It is not clear that Bonnie Durrenberger is actually a doctor, as Plaintiff avers, nor
does this letter state that Plaintiff may return to work.  Not only does the Court find these
inconsistencies between Plaintiff's argument and the underlying factual record disquieting,
counsel is also reminded that a court does not consider arguments in a brief as evidence in
making its determination, but rather, considers only the document itself.  See Versarge v.
Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

a "short hour" schedule to accommodate her limitations from her previous shoulder injury. (Leikauf Decl. Ex. A-2.)

As Dr. Hinkle's April 29, 1995 letter addressed limitations from Plaintiff's previous shoulder injury, and did not address Plaintiff's fitness to return to duty after her maternity absence, Postmaster Hopkins sought guidance from Dr. Rorro as to how to proceed. (Donnelly Decl. Ex. 11 (Hopkins May 4, 1995 letter to Dr. Rorro).) Dr. Rorro told Hopkins that Dr. Hinkle's letter was unacceptable to qualify Plaintiff as fit for duty after her maternity absence. Because Dr. Hinkle's letter referenced Plaintiff's previous work-related shoulder injury, Dr. Rorro referred the letter to Defendant's Workers Compensation Specialist, Richard Overton. (Donnelly Decl. Ex. 12 (Rorro Aff).) On May 22, 1995, Overton wrote to Dr. Hinkle asking whether Plaintiff's absence was due to maternity reasons or her previous work-related injury. Overton stated that Defendant could not allow Plaintiff to return to work without an understanding of "the full extent of her limitations and medical condition." (Donnelly Decl. Ex. 7b.) Dr. Hinkle responded to Overton by letter dated June 23, 1995, wherein he explained that Plaintiff had been absent from work since October 1993 for maternity reasons. He also noted, however, that she had continuing shoulder problems and recommended "a thorough work hardening capacity exam to assess the extent of her physical ability." (Donnelly Decl. Ex. 7c.)

Neither party clearly explains in their briefs what transpired during the period after Dr. Hinkle's June 23, 1995 response to Overton and up to October 1995. On October 13, 1995, Hopkins wrote to Lynn Goldstein, Defendant's Senior Labor Relations Specialist, requesting of her office "the proper preparation of the action letter that will provide us the best opportunity to successfully terminate [Plaintiff]." (Leikauf Decl. Ex. B-2.) In this letter, Hopkins stated that he

had spoken to Plaintiff and her union representative since Overton's May 22, 1995 letter to Dr. Hinkle, and that he had advised them that more suitable medical evidence was required before she could return to work, but that Plaintiff had not submitted anything further to him.  (Id. at p. 3.)  Hopkins also stated that he contacted the workers compensation department regarding Plaintiff, and was told that she was not being considered for "Workmen's Compensation or rehabilitation status."  (Id.)  As a result of Plaintiff's continued absence, Hopkins sought Goldstein's guidance in preparing "an appropriate removal action."  (Id.)

On October 18, 1995, Plaintiff wrote to Overton herself, attempting to explain what Dr. Hinkle meant in his April 29, 1995 letter.  Plaintiff stated that Dr. Hinkle's recommendation of a shortened schedule had nothing to do with her previous injury, but only sought to prevent "re-injury due to strain on out of shape [sic] muscles."  (Leikauf Decl. Ex. C-1.)  Plaintiff contends, again without supporting documentation, that Overton responded to her on November 30, 1995, stating that his office was no longer involved in her matter.

On December 21, 1995, Postmaster Hopkins and one of Plaintiff's supervisors, Joseph Natalicchio, signed a factual report required by Defendant for any action of corrective discipline. In the report, they noted their decision to issue a letter of removal to Plaintiff for her absence and failure to provide a proper doctor's note allowing a return to duty.  (Leikauf Decl. Ex. B-3.) Hopkins and Natalicchio also noted that on December 1, 1995, Defendant sent Plaintiff a Letter of Availability for Duty, and that she responded by telephone on December 13, 1995, stating that she was ready to work but only under the restrictions outlined by Dr. Hinkle.  (Id.)  They claim they told Plaintiff that she had to submit proper documentation showing that she was fit for duty or further action would be taken against her.  As of the December 21, 1995 report, Plaintiff had

-5-

not submitted further documentation.  (Id.)

Plaintiff claims that she then received a Notice of Removal on January 30, 1996.  The notice stated that Plaintiff would be removed effective March 8, 1996, due to her unjustified absence and her failure to provide documentation verifying her ability to return to her position in the same capacity as prior to her absence.  (Donnelly Decl. Ex. 15.)  The notice also advised Plaintiff that she could file an appeal under the union's grievance arbitration procedures.  (Id.) Dr. Hinkle then wrote a letter dated February 20, 1996, stating that, in light of his examination of Plaintiff on February 2, 1996, he determined she was "fully recovered from her pregnancy and childbirth and she ha[d] no complications which would impact on her job performance." (Leikauf Decl. Ex. A-4.)  Dr. Hinkle stated that Plaintiff could return to work under her December 1990 job description.  (Id.)  It is unclear when this letter was mailed, however, and Defendant claims it was unaware of this letter until after February 1996.  (Def.'s Br. 15.)

The union again filed a grievance with Defendant on this most-recent notice of termination.  Following negotiations, Hopkins denied the grievance in a letter to the union's Vice President, Kevin Meiners, because Plaintiff, to Hopkins's knowledge, still had not submitted any "medical clearance stating that she could return to her former duties."  (Leikauf Decl. Ex. B-4.) At some point Hopkins became aware of Dr. Hinkle's February 20, 1996 letter clearing Plaintiff to return to work, although Defendant does not explain how.  Hopkins then wrote to Dr. Rorro on March 22, 1996, to schedule Plaintiff for an evaluation in order to return Plaintiff to work by April 1, 1996.  (Donnelly Decl. Ex. 7d.)  Hopkins also prepared a "last chance agreement," dated March 27, 1996, to settle all remaining disputes.  The last chance agreement stated that it would be a final and binding resolution of the dispute, but that it required Plaintiff to forego any future

appeals through "the Grievance/Arbitration procedure or the E.E.O. Complaint procedure of the U.S. Postal Service or the Merit Systems Protection Board." (Donnelly Decl. Ex. 17.) On March 29, 1996, Defendant's Dr. Clancy evaluated Plaintiff, and recommended that she return to work with certain restrictions. However, Plaintiff did not sign the last chance agreement, she did not return to work, and instead, the matter proceeded through the grievance/arbitration process.

On April 5, 1996, Plaintiff sought pre-complaint EEO counseling and specified sex, age, and retaliation as the basis for the alleged discrimination. (Donnelly Decl. Ex. 8.) As Plaintiff's union grievance proceeded, Hopkins sent a letter dated April 9, 1996, to Kevin Meiners, the union's Vice President, disagreeing that Defendant prevented Plaintiff from working. Hopkins maintained that Plaintiff had not resumed work because she refused to sign the last chance agreement, to which she had already verbally agreed. (Leikauf Decl. Ex. B-6.) Thus, Hopkins denied this latest grievance. (Id.) Thereafter, Plaintiff's grievance proceeded to arbitration.

On October 3, 1996, Plaintiff filed a formal EEO complaint alleging sex, age, retaliation, and handicap as the bases for discrimination resulting in her March 8, 1996 notice of removal. (Donnelly Decl. Ex. 9.) Meanwhile, the arbitration of Plaintiff's union grievance proceeded and on December 28, 1997, an arbitration panel sustained her grievance and reinstated her with back pay from May 2, 1995. On April 28, 1998, the award was made final. The arbitration panel found that Defendant had failed to meet its burden of proof in establishing that Plaintiff had failed to respond to the letters of availability. (Leikauf Decl. Ex. E-1.)

As to Plaintiff's EEO claim that she filed on October 3, 1996, in March 2000, an EEOC Administrative Judge ("AJ") issued a decision without a hearing, and determined that Defendant did not discriminate against Plaintiff. (Donnelly Decl. Ex. 10 at p. 2.) On November 12, 2002,

the EEOC affirmed the AJ's decision.  (Id. at p. 4.)  As noted in the parties' previous submissions

to this Court, on April 21, 2003, the EEOC declined to reconsider its November 12, 2002

decision.  (Leikauf Decl. in Opp'n to Def.'s Mot. to Dismiss [docket no. 16] Ex. P.)

PROCEDURAL HISTORY

On July 24, 2003, within the ninety-day time limit required by the EEOC's April 21, 2003

right-to-sue letter, Plaintiff submitted a pro se Complaint and application to proceed in forma

pauperis ("IFP").  On September 8, 2003, the Court denied Plaintiff's application.  On October 3,

2003, Plaintiff filed her Complaint, still pro se, and paid the accompanying filing fees.[3]  After

procuring counsel, Plaintiff filed an Amended Complaint on March 17, 2005.  On May 25, 2005,

Defendant filed a motion to dismiss Plaintiff's Amended Complaint, in part, and for partial

summary judgment.  On March 31, 2006, the Court granted Defendant's motion and dismissed

all of Plaintiff's claims except for her Title VII claims for gender discrimination and retaliation

contained in Counts I, II, and III of the Amended Complaint.  After discovery, Defendant's

instant Motion for Summary Judgment of Plaintiff's remaining claims followed.

---

[3]     Plaintiff failed to file her Complaint within the ninety-day period as mandated by 29 C.F.R. § 1614.407.  When the EEOC notified her of its decision not to reconsider its November 12, 2002 ruling, it stated that filing a request that the Court appoint an attorney to represent her and that the Court permit her to file the action without payment of fees would not extend the ninety-day period.  Even if the Court were to toll the period between Plaintiff's submission of her Complaint and IFP request on July 24, 2003, and the Court's denial of her IFP request on September 8, 2003, Plaintiff still did not file her Complaint until October 3, 2003, almost one month later and well outside the ninety-day period.  However, as Defendant has not raised this issue of timeliness, the Court rules based on the merits of Plaintiff's claims.  See Wilson v. MVM, Inc., 475 F.3d 166, 174 (3d Cir. 2007) ("'The time limits in Title VII are in the nature of statutes of limitation.  They do not affect the district court's subject matter jurisdiction,'" and are "'subject to waiver, estoppel, and equitable tolling.'") (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Hornsby v. U.S. Postal Serv., 787 F.2d 87, 89 (3d Cir. 1986)).

<u>DISCUSSION</u>

Defendant argues that no genuine issue of material fact exists because Plaintiff has failed to establish a prima facie case of either gender discrimination or retaliation, or, if the Court finds Plaintiff has established a prima facie case, Plaintiff has failed to show that Defendant's legitimate, nondiscriminatory reasons are pretextual.  Plaintiff contends that she can establish both a prima facie case and pretext in both claims.  The Court agrees that Plaintiff has failed to establish a prima facie case on either claim and, thus, will grant Defendant's Motion.

A.      <u>Standard of Review</u>

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1366 (3d Cir. 1996).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323; <u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412, 414 (3d Cir. 1999).  The moving party may cite to the pleadings, depositions, answers to interrogatories, or admissions on file, to demonstrate that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). "[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."  <u>Jersey Cent. Power & Light Co. v. Twp. of Lacey</u>, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

B.      <u>Gender Discrimination</u>

Plaintiff asserts that Defendant discriminated against her because of her gender and pregnancy by refusing to permit her to return to work, making disparaging comments regarding

her sex and pregnancy, and improperly terminating her.  (Am. Compl. Counts I-III.)

Discrimination claims under Title VII are generally analyzed under the McDonnell Douglas burden-shifting framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Bray v. Marriott Hotels, 110 F.3d 986, (3d Cir. 1997).  In this analysis, a plaintiff must first prove a prima facie case of discrimination.  See McDonnell Douglas, 411 U.S. at 802. Once this initial showing has been made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Id.  If the defendant provides a nondiscriminatory reason for its decision, the burden shifts back to the plaintiff who then must discredit the defendant's proffered reason for its adverse employment action as mere pretext.  Id.

To establish a prima facie case of gender discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).  Title VII also prohibits gender discrimination based on pregnancy.  42 U.S.C. § 2000e(k). The prima facie standard is not intended to be rigid, mechanized, or ritualistic, and may vary depending on the particular facts at hand.  The central focus of the inquiry is always whether the employer treated the plaintiff differently because of her sex.  See Pivirotto v. Innovative Sys., 191 F.3d 344, 352 (3d Cir. 1999) (citations omitted).  The prima facie case requires a plaintiff to present "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."  Id. at 355 (citations omitted).

Here, Defendant does not dispute that Plaintiff has satisfied prongs one through three, but does dispute that Plaintiff has presented facts or circumstances that give rise to an inference that

this decision was based upon discrimination.  (Def.'s Br. 21.)  Plaintiff contends that an inference

of discrimination is evident because Postmaster Hopkins would not let her return to work without

"detailed information about [her] pregnancy" that he wanted "[f]or his own perverse reason."

(Pl.'s Opp'n at xii.)  Plaintiff also claims that Hopkins "demanded unnecessary personal records,

locked [her] out, lied to his HR expert, and used his lockout as part of the basis to secure [her]

proposed removal."  (Id.)

       Plaintiff has not presented sufficient evidence that would give rise to an inference of

gender discrimination.  There is no evidence, other than Plaintiff's unsupported accusations, that

Hopkins required any detailed information about Plaintiff's pregnancy.  Rather, Defendant, as an

entity, requested that Plaintiff provide medical documentation attesting to her fitness for her

return to the same duties after her extended absence, which had begun at the culmination of her

pregnancy.  Plaintiff's bald assertions that, because of her gender, Hopkins demanded

unnecessary records, locked her out, lied, and made disparaging comments about her sex and

pregnancy are unsupported and, thus, insufficient.  See Jersey Cent. Power & Light Co., 772 F.2d

at 1109.  Further, because Defendant's first communication to Plaintiff in February 1995 came

almost one and a half years after Plaintiff left work for maternity reasons in October 1993, there

is no significant temporal connection that could support an inference of pregnancy

discrimination.  Finally, Plaintiff has made no showing that Defendant treated her differently

than it would have treated an absent non-pregnant or male employee.  See In Re Carnegie Ctr.

Assocs., 129 F.3d 290, 297 (3d Cir. 1997).  Although Plaintiff, in her letter supporting her EEO

claim, names several men and women who returned to work after various absences, she does not

show that Defendant treated these persons differently than her because they were not pregnant, or

because they were male.  (See Leikauf Decl. Ex. D-2.)  Thus, Plaintiff has failed to establish a

prima facie case of discrimination based upon either gender or pregnancy.

     Even if the Court were to find that Plaintiff had established a prima facie case of

discrimination, she still fails to show that Defendant's proffered nondiscriminatory reasons are

pretextual.  To show pretext, Plaintiff must point to some evidence from which a reasonable jury

could either disbelieve Defendant's proffered reasons, or believe that invidious discrimination

was the cause of the adverse action.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Defendant asserts that it followed the provisions of the Employee and Labor Relations Manual

("ELM"), requiring from Plaintiff a fitness for duty report after her maternity leave.  (Def.'s Br.

23; Donnelly Decl. Ex. 13.)  Defendant claims that such a report is required for any employee

whose leave "is of such a nature as to raise justifiable doubt concerning the employee's ability to

satisfactorily and/or safely perform [her] duties."  (Id.)  Plaintiff has failed to discredit this claim.

     Because Dr. Hinkle's April 29, 1995 letter did not address Plaintiff's recovery from her

pregnancy, and because it suggested further limitations due to her previous worker's

compensation shoulder injury, Defendant deemed the letter unacceptable and did not permit

Plaintiff to return until more acceptable documentation was provided.  (Def.'s Br. 15.)  Plaintiff's

unsupported accusations that Defendant required information regarding her pregnancy recovery

for unnecessary and discriminatory reasons, and not in an attempt to conform to the ELM, are

insufficient to show pretext.  While Plaintiff contends that Defendant further delayed her return

to work by an improper referral of the matter to the worker's compensation department, (Pl.'s

Opp'n at iv), this is not evidence of discrimination.  See Fuentes, 32 F. 3d at 765 ("[T]he plaintiff

cannot simply show that the employer's decision was wrong or mistaken, since the factual

-12-

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")  Therefore, Defendant's Motion for Summary Judgment will be granted on Plaintiff's claim of gender and pregnancy discrimination.

C.     Retaliation

Plaintiff claims that Defendant unlawfully retaliated against her for exercise of her protected rights in "locking her out from her job" and "improperly terminating her."  (Am. Compl. Counts II-III.)  The McDonnell Douglas burden-shifting standard articulated above also governs retaliation claims under Title VII.  To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action.  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  Defendant does not dispute that Plaintiff engaged in protected activity in filing a previous EEO claim, and that she suffered an adverse employment action in her termination.  Defendant does dispute whether Plaintiff engaged in protected activity in refusing to sign the last chance agreement and whether any adverse action was caused by her participation in any protected activity.  It is clear Plaintiff has satisfied the first prong of a prima facie case as she undisputedly submitted an EEO claim in 1989.  (Def.'s Br. 25.)  Plaintiff has also satisfied the second prong as she suffered an adverse employment action in her termination. Plaintiff fails, however, on the third prong of causal connection and, thus, fails to establish a prima facie case of retaliation.

A plaintiff may establish a causal connection between protected activity and adverse employment action by, for example, evidence of unusually suggestive temporal proximity,

-13-

Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997), or an intervening period of antagonism between the protected activity and the adverse employment action, Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d. Cir. 1993).  Here, there is no temporal proximity between Plaintiff's 1989 EEO claim and her termination effective in March 1996, seven years later.  Nor has Plaintiff established any period of antagonism that would link her 1989 protected activity with her 1996 termination.  As to other indicia of retaliatory animus, Plaintiff's sole evidence is her unsupported statement in her deposition that other workers resented her because she was not required to work weekends.  (Leikauf Decl. Ex. G at 81:22-83:9.)  Such a bare allegation is insufficient to show that her 1989 EEO claim caused her 1996 termination.

Plaintiff also argues that her refusal to sign the last chance agreement in March 1996, and thereby waive her EEO rights as to this particular dispute, resulted in her retaliatory termination. (Pl.'s Opp'n at xiv-xv.)  Defendant argues that the waiver in the last chance agreement is not evidence of retaliation because such agreements are routine, permissible, and enforceable. (Def.'s Br. 4-5.)  Regardless of the potential enforceability of the last chance agreement waiver, Plaintiff has presented no evidence that her refusal to waive her EEO rights caused her termination, other than the close temporal proximity between her refusal to sign the last chance agreement and the enforcement of Plaintiff's termination.  Defendant's notice of removal indicating that Plaintiff's termination would be effective March 8, 1996, referred to her extended absence from work and her failure to provide acceptable medical documentation attesting to her fitness for a return to duty.  (Donnelly Decl. Ex. 15.)  Had Plaintiff not filed a grievance, her termination would have become effective for those reasons.  The product of Plaintiff's grievance, however, was a settlement embodied in the last chance agreement.  (Donnelly Decl. Ex. 17.)

-14-

Defendant did not terminate Plaintiff because of her refusal to sign the agreement, rather, it would not reinstate her.  Thus, it cannot be fairly said that her refusal to waive her EEO rights caused her termination.  See Maldonado v. Sw. Bell Tel., L.P., No. SA-05-CA-987-XR, 2006 U.S. Dist. LEXIS 79273, at *13 (W.D. Tex. Oct. 30, 2006) (finding that the plaintiff did not engage in protected activity and there was no retaliation when he declined the offer in a last chance agreement to release any and all Title VII claims in exchange for reinstatement). Therefore, Plaintiff's claim of retaliation fails.

CONCLUSION

Because Plaintiff has failed to establish a prima facie case of gender discrimination or show that Defendant's nondiscriminatory reasons are pretextual, and has failed to establish a prima facie case of retaliation, Defendant's Motion for Summary Judgment will be granted.  The accompanying Order will be entered.

s/ Anne E. Thompson<br>ANNE E. THOMPSON, U.S.D.J.

Dated:      7/24/2007

-15-